**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ROBERT J. CAULLEY,**

    Petitioner,                                   **CASE NO. 2:11-CV-00195
JUDGE SMITH**
    v.                                                **MAGISTRATE JUDGE ABEL**

**MICHELE MILLER, WARDEN,**

    Respondent.

## OPINION AND ORDER

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the instant petition, Respondent's *Return of Writ* and *Supplemental Response*, and the exhibits of the parties. For the reasons that follow, the Petitioner's *Motion for Leave to Amend the Petition*, Doc. 10, is **GRANTED**. Petitioner's *Request for a Stay*, Doc. 11, also is **GRANTED.**

Petitioner is **DIRECTED** to keep the Court advised of the status of state court proceedings.

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> Charles and Lois Caulley were found bludgeoned and stabbed to death in their home on Stringtown Road in Grove City, Ohio, on Sunday, January 16, 1994. The deaths were reported in a 9–1–1 telephone call made by appellant, who explained that he had gone to his parents house and found them dead. At the time of the elder Caulleys' death, appellant was employed by his father in the family plumbing business, C.J. Caulley Plumbing. A lengthy and extensive investigation by the Franklin County Sheriff's office was unable to develop any physical evidence from which to conclusively link anyone to the murder. No

fingerprints were found on the knives used in the slayings, no footprints detected other than those of the EMT personnel, and no witnesses were found. Investigating officers pursued several leads provided by tipsters, without success.

The investigating officers, however, remained suspicious of appellant even while the investigation otherwise stalled for nearly three years. The suspicions developed because of several perceived inconsistencies between statements given by appellant after the murders. In addition, several persons had noted that after the murders, appellant had a scratch on his face and a bruise on his neck which looked like a thumb print. Appellant explained the scratch by stating that his young son had caused it. Authorities further concluded that appellant had both the opportunity and motive to commit the crime, based upon disagreements with his father over the future of the plumbing business, the fact that appellant had, along with his two sisters, inherited substantial amounts of money upon his parents' death, and that appellant's sole alibi on the presumed night of the murder was provided by his wife.

Almost three years after the murders, in December 1996, Franklin County Sheriff's Detective Zachary Scott and Sergeant Tony Rich flew to Houston, Texas, where appellant was employed as an aeronautical engineer with Continental Airlines. They went to appellant's workplace and requested that he voluntarily come to the Harris County (Houston) Sheriff's office for an interview. Appellant was transported in the officers' car and the interview began at approximately 3:20 p.m. on the afternoon of December 3, 1996. After a lengthy interview, which was punctuated by the arrival of appellant's wife, appellant, over the vigorous protestations of his wife, produced an incriminating statement which was tape-recorded by the officers. Appellant stated that he had gone to his parent's home after attending a hockey game on the night of Friday, January 14, 1994, where a discussion with his father deteriorated into a confrontation, during which his father pushed appellant causing him to fall onto and break a table. According to appellant's statement, the argument thereafter escalated until appellant hit his father with a baseball bat and then stabbed him. When appellant's mother intervened, he struck and stabbed her as well.

After appellant made his statement in Houston, the interviewing officers telephoned Franklin County Assistant Prosecutor Dan Hogan, who advised them that appellant could be arrested based upon his

statement. Appellant waived extradition and was returned to Columbus the following day.

Appellant's wife also flew to Columbus shortly thereafter. Again on the advice of Assistant Prosecutor Hogan, she was subsequently arrested by the investigating officers for obstruction of justice, based upon her prior statements providing an alibi for appellant on the night of the murders. The investigating officers attempted to use Celeste Caulley's arrest as leverage to encourage appellant, who in the interim had refused to give a more detailed statement, to resume his dialogue with the investigating officers. Celeste Caulley was soon thereafter released and the charges against her dropped upon the personal intervention of Assistant Prosecutor Hogan. No further incriminating statements by appellant appear to have emerged from this particular phase of the investigation.

Appellant was initially charged with two counts of aggravated murder with death penalty specifications and one count of aggravated robbery. Counsel for appellant duly filed a motion to suppress the incriminating statement made by appellant in the Houston interview, based upon violation of the right to counsel and the generally coercive nature of the interview. The trial court held an extensive suppression hearing prior to trial and ruled that the statement was admissible.

The matter thereafter proceeded to trial before a jury. The evidence introduced by the prosecution consisted first and foremost of appellant's confession given to the investigating detectives in Houston, in the form of an audiotape and a transcript. In addition, the prosecution presented testimony and other evidence intended to buttress the confession by demonstrating that the physical characteristics of the crime scene conformed to appellant's description in his confession as to how he committed the killings, and to demonstrate that appellant's personal, financial and career circumstances, as well as his strained relationship with his father and mother, gave him a motive to commit the murders.

The principal witness for the prosecution was Detective Scott, who testified extensively regarding the circumstances surrounding appellant's confession when interviewed in Houston. Detective Scott also testified generally about the course of the investigation immediately after the murders and over the three years that intervened between the crimes and appellant's confession. On cross-examination,

Detective Scott agreed that during the course of his lengthy investigation he had been unable to establish any physical evidence linking appellant or anyone else to the crime, and that his continued suspicion of appellant was based principally upon apparent financial motive and appellant's reportedly strained relationship with his father. This belief on the part of Detective Scott had been reinforced when he sought assistance from the FBI in developing a profile of the killer.

The state also presented the testimony of former Assistant Prosecutor Dan Hogan, who, in the interim, had taken a seat on the bench of the Franklin County Common Pleas Court. Judge Hogan testified extensively in order to explain his interaction with the investigating detectives during appellant's interview, arrest, and subsequent detention upon being transported to Columbus.

In addition, the state presented testimony of former employees of C.J. Caulley Plumbing, who generally described appellant as not particularly suited for the physical side of the plumbing business. Steve Young, a former employee and master plumber, stated that he had left the business when appellant returned to Columbus and began working for his father full time. Young testified that he had previously turned down an offer to buy the business himself and did not care to "carry" appellant if appellant took over the business.

Several friends of the victims also testified regarding the generally peaceful and well-regulated lives of the deceased couple, and their sometimes strained relationship with their children, including appellant and his wife. Friends also testified about the activities of the victims on the night of Friday, January 14, 1994, the night on which the prosecution postulated that the murders occurred, upon the victims returning to their home at approximately midnight.

Forensic Pathologist Patrick Fardal, of the Franklin County Corner's office, testified that he examined the victims on Sunday, January 16, 1994, the day they were found dead. Dr. Fardal concluded that both victims died from a combination of stab wounds and blunt instrument trauma to the head, although the precise cause of death could not be isolated in either case, as any number of individual blows or wounds could have proved fatal. Dr. Fardal's best estimate of the time of death, however, did not completely coincide with the prosecution's theory that the victims had been killed late Friday or early Saturday morning prior to being found; with respect to Mr. Caulley, Dr. Fardal concluded that he had died eight to twelve hours before examination

on Sunday, and with respect to Mrs. Caulley, more than two and less than twelve hours before examination. For both victims this would have put the time of death between late Saturday night and early Sunday morning.

The prosecution also presented, over objection, the testimony of Todd Elkins, a prisoner formerly held in the Franklin County Jail with appellant. Elkins testified that appellant had stated that he wished to kill the assistant prosecutor in his case and had offered Elkins $10,000 to do so. Elkins testified that appellant planned to profit from the resultant delay in trial to obtain bond and flee.

Defendant testified on his own behalf, stating that he had not gone to his parents' home between leaving work Friday afternoon and discovering the bodies on Sunday morning, when he went to their home to borrow a tool. He stated that he had gone straight home after the hockey game Friday night, and subsequent testimony by his wife Celeste supported this alibi. Appellant described his interview with Detective Scott and Sergeant Rich in Houston, and stated that his confession in Houston was completely untrue and that he had only told the deputies what they seemed to want to hear in order to gain time to consult an attorney and avoid being indicted on aggravated murder charges, as the deputies had threatened to do.

The defense also presented the testimony of Dr. Richard Ofshe, described as an expert on the field of interrogation, and particularly on the production of false or unreliable confessions induced by certain interrogation techniques. Dr. Ofshe even-tually opined that the techniques employed by the investigating officers in the present case produced a strong likelihood of unreliable or false confession.

The jury ultimately rejected the aggravated murder charges, but returned verdicts finding appellant guilty of murder in the death of his mother and voluntary manslaughter in the death of his father. The jury found appellant not guilty of aggravated robbery. Appellant was sentenced to fifteen years to life on the murder conviction and ten to twenty-five years imprisonment on the manslaughter conviction, to be served consecutively.

Since appellant's sentencing on October 20, 1997, the present appeal has been considerably delayed by disputes over whether appellant is entitled to appointed counsel due to his alleged indigency. These questions were addressed by this court in *State v. Caulley* (Sept. 9,

1999), Franklin App. No. 98AP–74, unreported, and the matter is now finally before us on appellant's direct criminal appeal.

*State v. Caulley,* No. 97AP-1590, 2002 WL 392191, at *1-4 (Ohio App. 10th Dist. March 14, 2002).

Petitioner raised the following assignments of error on appeal:

> ASSIGNMENT OF ERROR ONE
>
> (a) WHEN TESTIMONY AT A MOTION TO SUPPRESS HEARING SHOWS THE ACCUSED REQUESTED AN ATTORNEY DURING CUSTODIAL INTERROGATION, AND NONE WAS PROVIDED, THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS THE STATEMENT, CONTRA THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
>
> (b) WHEN TESTIMONY AT A MOTION TO SUPPRESS HEARING SHOWS THE ACCUSED INVOKED HIS RIGHT TO COUNSEL DURING INTERROGATION BY LAW ENFORCEMENT OFFICIALS, THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS THE STATEMENT, CONTRA THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
>
> ASSIGNMENT OF ERROR TWO
>
> WHEN AN ASSISTANT PROSECUTOR TESTIFIES IN THE CASE IN CHIEF, AND DETAILS THE ADVICE HE GAVE DETECTIVES DURING THE ARREST STAGES OF THE CASE, THE RESULTING EFFECT WAS CONTRA THE FAIR TRIAL RIGHTS OF THE ACCUSED, UNDER THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
>
> ASSIGNMENT OF ERROR THREE
>
> (a) WHEN TESTIMONY IS INTRODUCED BY THE PROSECUTION THAT CLAIMS THE ACCUSED WAS INVOLVED IN A CONSPIRACY TO HARM THE ASSISTANT PROSECUTOR, AND THAT CLAIM IS SHOWN TO BE UTTERLY GROUNDLESS, THE ACCUSED DOES NOT RECEIVE A FAIR TRIAL, CONTRA THE FOURTH, FIFTH,

SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

(b) EVIDENCE OF THREATS CLAIMED TO BE MADE BY THE ACCUSED AGAINST THE ASSISTANT PROSECUTOR, SHOWN TO BE GROUNDLESS, ARE IMPROPER AS A MATTER OF LAW, CONTRA THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

ASSIGNMENT OF ERROR FOUR

WHERE THE RECORD AT PRE–TRIAL SHOWS THE DEFENSE SPECIFICALLY REQUESTED CERTAIN EX–CULPATORY MATERIAL FROM THE PROSECUTION, AND IT IS SUBSEQUENTLY DETERMINED THE PROSECUTION DID NOT SUPPLY SAID MATERIAL, THE EFFECT IS TO DENY THE ACCUSED A FAIR TRIAL UNDER THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

ASSIGNMENT OF ERROR FIVE

EVIDENCE OF PLEA NEGOTIATIONS IS INADMISSIBLE IN A JURY TRIAL; WHERE THE PROSECUTION INTRODUCES DETAILED TESTIMONY OF PLEA NEGOTIATIONS, THE EFFECT IS CONTRA THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS AND EVID. R. 410(a)(5).

ASSIGNMENT OF ERROR SIX

WHERE THE RECORD REVEALS THAT THE CONFESSION WAS INVOLUNTARY, THE ERROR IN ADMITTING IT AT TRIAL RESULTED IN A VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.

ASSIGNMENT OF ERROR SEVEN

DURING DELIBERATIONS THE TRIAL COURT COMMITS ERROR IN ALLOWING THE TAPE TO BE VIEWED ON NUMEROUS OCCASIONS BY THE JURY, OVER THE OBJECTIONS OF THE DEFENSE, THEREBY UNDULY EMPHASIZING THAT PARTICULAR EXHIBIT CONTRA THE

SIXTH AMENDMENT.

*Id.* at *4. On March 14, 2002, the appellate court affirmed the judgment of the trial court. *Id.* On August 7, 2002, the Ohio Supreme Court dismissed Petitioner's appeal. *State v. Caulley*, 96 Ohio St.3d 1467 (2002).

> On June 12, 2002, defendant-appellant, Robert J. Caulley, filed an application to reopen his appeal and the judgment of this court rendered in *State v. Caulley* (Mar. 14, 2002), Franklin App. No. 97AP-1590.

*State v. Caulley*, 97AP-1590, 2002 31839216, at *1 (Ohio App. 10th Dist. Dec. 19, 2002). In Rule 26(B) proceedings, Petitioner asserted he had been denied effective assistance of appellate counsel because his attorney failed to raise on appeal a claim that he was denied a fair trial because the trial court refused to permit him to call Christie Tackett, Jason Friend, or Kim Kelson as defense witnesses; and that he was denied effective assistance of trial counsel because his attorney failed to request the trial court to call Ricky Nelson as a witness and failed to object to testimony of Judge Hogan. *See id.* On December 19, 2002, the appellate court denied Petitioner's Rule 26(B) application. *Id.* On April 2, 2003, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Caulley*, 98 Ohio St.3d 1515 (2003).

Petitioner also pursued post conviction relief.

> Defendant filed the present petition for post-conviction relief on July 27, 2001. The state did not respond until March 19, 2004, apparently due to a failure of service. Defendant then filed an application for DNA testing under R.C. 2953.71 et seq. The court granted in part the application for DNA testing on some of the suggested items from the crime scene, but denied defendant's request that (1) a private laboratory, rather than the State Bureau of Criminal Investigation ("BCI"), perform the test, and (2) an independent expert observe testing at BCI.
>
> The DNA testing results from BCI eventually proved inconclusive.

> Defendant then filed a motion for leave to amend his post-conviction petition, a submission of supplemental exhibits, and a motion for additional DNA testing. Defendant also sought additional discovery of the data results supporting BCI's summary DNA report. Without conducting an evidentiary hearing, the trial court dismissed the pending motions and the post-conviction petition itself.

*State v. Caulley,* No. 07AP-338, 2007 WL 4532671, at *1 (Ohio App. 10th Dist. Dec. 27, 2007).

Petitioner timely appealed, raising the following assignments of error:

> ASSIGNMENT OF ERROR NO. I
>
> THE TRIAL COURT ERRED BY APPLYING THE DOCTRINE OF RES JUDICATA TO BAR CAULLEY'S FIRST, THIRD, FORTH [sic] SIXTEENTH [sic], SEVENTEENTH [sic], AND EIGHTEENTH [sic] GROUNDS FOR RELIEF.
>
> ASSIGNMENT OF ERROR NO. II
>
> THE TRIAL COURT ERRED IN DISMISSING CAULLEY'S POST-CONVICTION PETITION WHEN HE PRESENTED SUFFICIENT OPERATIVE FACTS TO MERIT RELIEF OR, AT MINIMUM, AN EVIDENTIARY HEARING.
>
> ASSIGNMENT OF ERROR NO. III
>
> THE TRIAL COURT ERRED IN DISMISSING CAULLEY'S MOTION FOR LEAVE TO FILE AMENDMENTS TO HIS POST-CONVICTION PETITION AS UNTIMELY WHEN HE DEMONSTRATED GOOD CAUSE FOR ANY DELAY AS WELL AS PREJUDICE TO CAULLEY.
>
> ASSIGNMENT OF ERROR NO. IV
>
> THE TRIAL COURT ERRED WHEN IT DENIED CAULLEY'S POST-CONVICTION PETITION WITHOUT FIRST AFFORDING HIM THE OPPORTUNITY TO CONDUCT DISCOVERY.
>
> ASSIGNMENT OF ERROR NO. V
>
> THE TRIAL COURT ERRED BY DENYING CAULLEY'S MOTION FOR ADDITIONAL DNA TESTING BASED ON BCI'S DNA TEST RESULTS ON THE FIRST SET OF ITEMS.

*Id*. at *1-2. On December 27, 2007, the appellate court affirmed the judgment of the trial court. *Id.* On May 21, 2008, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Caulley*, 118 Ohio St.3d 1411 (2008).

> On February 6, 2008, defendant filed another application for DNA testing of "all of blood evidence and hair evidence that was collected at the scene," with a supporting memorandum listing 21 items for DNA testing. After the parties briefed the issue, the state filed a supplemental response stating that the hair found in Lois Caulley's hand at the crime scene, previously ordered to be DNA tested, had been discovered. The parties agreed further DNA testing was appropriate, and the state on May 8, 2008 filed a motion requesting an order for DNA testing of the discovered hair and "limited further testing of additional evidence in this case."
>
> Pursuant to the parties' agreement, the trial court on May 12, 2008 ordered Orchid Cellmark to conduct DNA testing on the discovered hair and up to four representative human hairs from a sweatshirt in evidence. The court further ordered, pursuant to the parties' agreement, that BCI conduct DNA analysis of six items on defendant's list: the sweatshirt, an H & R 20-gauge shotgun, a table leg, cartons or packs of cigarettes, or both, a White Castle cup, and swabs previously taken from an H & R .410 shotgun. Results from the tests were filed with the court on August 15, 2008 and October 2, 2008. The test results again were inconclusive but did reveal a partial DNA profile from an "unknown male" on the 20-gauge H & R shotgun, which had been found at the crime scene stacked with other items by the victims' front door.
>
> Based upon the test results, defendant on October 15, 2008 filed a "Motion for an Order Requiring Alternate Suspects to Submit Oral Samples Suitable for DNA Testing" in order to compare the DNA profiles of two individuals, who defendant claimed were potential suspects, to the "unknown male" DNA profile on the 20-gauge H & R shotgun. Defense counsel contended at trial that one or both of the individuals was involved in killing the victims in this case, but neither "alternate suspect" was a defendant in the action against defendant, and the trial court did not have personal jurisdiction over them.
>
> According to defendant, the first "suspect," who lived with his parents next door to the victims, exhibited suspicious behavior before and after the victims' murders; the second "suspect" purportedly bragged

> to several people about committing the murders and being a "burglar for a living" who broke into residences and stacked items in one spot before removing them. Defendant contended the "alternate suspects" would have touched or handled the shotgun in question only if one of them committed the murders. Thus, defendant argued, if the "unknown male" DNA profile on the 20-gauge H & R shotgun matches a DNA profile of one of the alternate suspects, it proves that individual was the real killer and exonerates defendant, notwithstanding his confession that he killed his parents. At the trial court's urging, defendant attempted to have the "alternate suspects" voluntarily submit oral samples for DNA testing. Although both of them verbally agreed to provide samples, neither individual submitted a biological sample for DNA testing.
>
> On December 9, 2008, defendant filed a supplemental memorandum with the trial court detailing his efforts to have the two alternate suspects submit samples for DNA testing and renewing his request for a court order requiring their cooperation. By judgment entry filed January 20, 2009, the trial court denied defendant's motion for an order requiring the alternate suspects to submit samples for DNA testing and dismissed defendant's second application for DNA testing.

*State v. Caulley,* No. 09AP-172, 2009 WL 3633815, at *1-3 (Ohio App. 10th Dist. Nov. 3, 2009).

Petitioner timely appealed, raising the following assignments of error:

> ASSIGNMENT OF ERROR NO. I
>
> THE TRIAL COURT ERRED BY DENYING CAULLEY'S MOTION FOR AN ORDER REQUIRING ALTERNATE SUSPECTS TO SUBMIT ORAL SAMPLES SUITABLE FOR DNA TESTING WHEN THESE ORAL SAMPLES WERE NECESSARY TO VINDICATE CAULLEY'S CONSTITUTIONAL RIGHT TO ESTABLISH HIS INNOCENCE THROUGH DNA TESTING.
>
> ASSIGNMENT OF ERROR NO. II
>
> THE TRIAL COURT ERRED BY DENYING CAULLEY'S SECOND APPLICATION FOR DNA TESTING WHEN ADDITIONAL DNA TESTING WOULD YIELD OUTCOME DETERMINATIVE RESULTS.

Id. at *3. On November 3, 2009, the appellate court affirmed the judgment of the trial court. *Id*.

On May 3, 2010, the Ohio Supreme Court dismissed Petitioner's subsequent appeal. *State v. Caulley*, 124 Ohio St.3d 1494 (2010).

Represented by the Ohio Public Defender, on March 3, 2011, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in violation of the Constitution of the United States based upon the following grounds:

> 1. Caulley is actually innocent of the crimes for which he is convicted. His convictions violate the U.S. Constitution. . . .
>
> 2. Caulley's rights to counsel, a fair trial, and due process were violated when the trial court admitted his confession into evidence, when that confession was involuntary and inadmissible. . . .
>
> 3. Caulley's constitutional right to due process was violated when the trial court erroneously prohibited Caulley from introducing exculpatory evidence. . . .
>
> 4. Caulley is entitled to habeas relief because the State suppressed material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and despite assurances to the contrary, the trial court failed to review the State's investigation file for exculpatory evidence. . . .
>
> 5. Caulley's right to a fair trial was violated when a judge, who was a former prosecutor, was allowed to testify and present irrelevant, prejudicial testimony. . . .
>
> 6. Caulley's right to a fair trial was violated when the trial court admitted testimony concerning threats made by the defendant, when that testimony was inadmissible. . . .
>
> 7. Caulley is entitled to habeas relief because of trial counsel's ineffectiveness. . . .
>
> 8. Caulley's due process rights were violated because appellate counsel failed to render effective assistance in his first appeal of right. . . .

> 9. Caulley is entitled to habeas relief because the State and the trial court violated his constitutional right to due process when they denied meaningful access to the physical evidence in order to conduct DNA tests. . . .
>
> 10. A trial court, consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment, cannot arbitrarily deny petitioners the right to file pleadings timely tendered in good faith. . . .
>
> 11. Caulley deserves habeas relief because his constitutional rights were violated when the trial court denied his Motion for Order Requiring Alternate Suspects to Submit Oral Samples Suitable for DNA Testing when these oral samples were necessary to vindicate Caulley's constitutional right to establish his innocence through DNA testing. . . .
>
> 12. Caulley's constitutional rights were violated because of the cumulative effect of multiple errors at his trial.

It is the position of the Respondent that these claims to provide a basis for federal habeas corpus relief.

Subsequent to the filing of his federal habeas corpus petition, again represented by counsel, on April 20, 2011, and June 21, 2011, Petitioner filed a motion for leave to file a delayed motion for a new trial and a motion for a new trial, asserting his trial counsel acted under a conflict of interest prior to and during trial by having a sexual relationship with Petitioner's wife, and that Petitioner was unable earlier to discover the basis for this claim. *Exhibit 101 to Return of Writ*. According to Petitioner, he learned about the affair from his ex-wife almost fourteen years after trial. *See id.* On July 11, 2011, Petitioner filed a *Motion for Leave to Amend the Petition* with the following additional claim:

> 13. Caulley's right to a fair trial and due process was violated when his trial counsel was operating under a conflict of interest while representing Caulley in his capital trial. . . .

13

*Motion for Leave to Amend the Petition,* Doc. 10. On the same date, Petitioner filed a motion to stay proceedings pending exhaustion of this claim in the state courts. Doc. 11.

Respondent opposes Petitioner's motion to amend the petition, arguing that the claim is time-barred under *Mayle v. Felix*, 545 U.S. 644 (2005), because it differs in time and type from those claims raised in Petitioner's timely habeas corpus petition. Respondent additionally contends that Petitioner failed to exercise diligence in discovering the factual predicate for his claim so as to render the claim timely filed under 28 U.S.C. § 2244(d)(1)(D).[1] According to Respondent Petitioner has failed to establish he exercised diligence in learning the factual predicate for his claim, because he never asked Carey Gravelle, his ex-mother-in-law, whether his wife had been having sexual relations with his attorney prior to and during his trial, and should have so inquired. *See Respondent's Memorandum in Opposition*, Doc. 12. Respondent similarly opposes Petitioner's request for a stay of proceedings, arguing Petitioner likewise has failed to establish good cause for failing to exhaust his claim and that the record fails to reflect Petitioner's unexhausted claim is potentially meritorious. *See Respondent's Opposition to Motion to Stay*, Doc. 13; *Rhines v. Weber*, 544 U.S. 269, 274 (2005)(a stay and abeyance of habeas corpus proceedings is appropriate only where the petitioner establishes good cause for failing to exhaust his claim and his claim is potentially meritorious).

---

[1] 28 U.S.C. 2244(d)(1) provides:

A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitations period shall run from the latest of –

\*\*\*

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Respondent's arguments are not persuasive. On September 8, 2011, the trial court issued a *Nunc Pro Tunc Entry* concluding to the contrary:

> The new evidence slowly came to light years after the defendant's conviction. The evidence was of an ambiguous nature when one considers it in terms of showing guilt or absence thereof. . . . [T]he evidence in this case involved a question of legal ethics, and without a lot of investigation by the defender's office, little or nothing to indicate a reasonable expectation of a new trial.
>
> Up until early this year defendant had insufficient evidence available to him to proceed with his effort to gain a new trial. Given his situation in prison and estranged from his ex-wife and prior lawyer, prevention of the discovery of meaningful evidence was unavoidable. It would seem that time considerations have never been a factor in this matter. It took two or three years between the termination of the active investigation of this case and the interrogation of the defendant in Texas and many more years before the development of the details of the affair giving rise to this issue.

*Exhibit 4 to Respondent's Supplemental Response,* Doc. 18. The affidavit of Celeste (Caulley) Bowman, Petitioner's ex-wife, dated February 9, 2011, indicates in relevant part:

> I never told Bob about the affair. Bob ultimately found out about the affair from his sister, recently. The first time I discussed the affair with Bob was briefly during my first visit with him in over 12 years in June 2010. I have since learned that Bob apparently believed that the affair was solely post-trial. Bob didn't know until approximately one month ago that the affair began pre-trial and lasted through the trial. We've now discussed that fact over email through the prison.
>
> My mother has been pleading with me for years to come forward regarding the affair with Jim. After visiting Bob for the first time in twelve years in June 2010, I had renewed feelings of guilt concerning the affair with Jim. Because of those feelings as well as my mother's insistence, I decided to come forward. In January 2011, I sent an email to Kim Rigby, Assistant State Public Defender, who currently represents bob, explaining my and Jim's relationship. . . .

*See Exhibit 101 to Return of Writ.* Petitioner indicates in his affidavit that he learned from his sister and mother-in-law "a few years ago" that his ex-wife and attorney had an affair "[b]ut by that time,

15

the whole thing was water under the bridge. My ex-wife and I hadn't spoken in several years, and we had been long-divorced." *See id.*

> I always assumed that this affair was solely post-trial. It was not until January, 2011 that I first heard that the affair started pre-trial and continued during trial. I was completely shocked. . . . I never would have guessed that Jim and Celeste were in a sexual relationship at that time.

*Id.*

As noted by the state trial court, nothing in the record reflects that Petitioner had any reason to believe his attorney and ex-wife were having a sexual relationship or ongoing affair prior to and during the time of his trial prior to the disclosure thereof, in January 2011. This Court thus concludes Petitioner has established his unexhausted claim is timely under 28 U.S.C. § 2244(d)(1)(D). Petitioner's request to amend the petition, Doc. 10, is **GRANTED**.

As to Petitioner's request for a stay,

> [A] stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. Cf. 28 U.S.C. § 2254(b) (2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

*Rhines v. Weber*, 544 U.S. at 277. Petitioner has established good cause for failing to exhaust his claim in the state courts. He was unaware of the basis for his claim, and unable reasonably to learn of the basis for his claim until his ex-wife disclosed the relationship, long after his convictions and appeals had concluded. Moreover, the record fails to reflect that Petitioner's claim is plainly meritless. On January 10, 2012, after a hearing, the trial court granted Petitioner's request for a new trial. *Exhibit 16 to Respondent's Supplemental Response*, Doc. 18. Respondent's appeal currently

remains pending.  Moreover, depending on the results of that appeal, the claims currently pending before this Court may become moot.

Petitioner's *Motion for Leave to Amend the Petition*, Doc. 10, is **GRANTED**. Petitioner's *Request for a Stay*, Doc. 11, also is **GRANTED.**

Petitioner is **DIRECTED** to keep the Court advised of the status of state court proceedings.

**IT IS SO ORDERED.**

                                                 /s/ George C. Smith

                                                 GEORGE C. SMITH
                                                 United States District Judge